Good morning, Your Honors. May it please the Court. Sean Woods on behalf of Appellant David Garcia. The briefing is pretty straightforward in this. It's a statute of limitations issue. It boils down to the simple fact that if someone has a brain injury and that brain injury is not being documented by the defendant that is supposed to be taking care of that person, how can you create hard evidence or how can you obtain hard evidence during the time that the statute of limitations period would originally run? Now, the judge in this case ruled that the statute of limitations ran, and therefore, any claims against Wexford are barred. Our argument is simple, and it's undisputed that Mr. Garcia suffered a traumatic brain injury at the hands of other inmates. He had two craniotomies. He had a hole in his head. He was in hospital for two months in medically induced coma and then under watch, and then he finally came back to the prison. Our claim is that the prison, the private group that was providing medical care did not provide the proper medical care to Mr. Garcia. The judge in this case says that we had to produce hard evidence during the time from his assault or the time that he filed the lawsuit plus two years. So the only question here with regard to statutory tolling is whether your clients presented sufficient evidence of unsound mind, inability to manage his daily affairs or understand his legal rights and obligations. That's the test that we apply, right? That's exactly the test you apply. And so can you address the district court's analysis of the deficiency in the presentation of the evidence? Of course. And that brings me back to my original point. The district court said, hey, you have evidence after. We have a declaration, an affidavit from his sister, who's also his caregiver, who has known him his entire life, and we also have a neurology report from Maricopa Integrated Health Services, and in both instances they say very clearly Mr. Garcia cannot cook his own food. Mr. Garcia cannot manage his finances. He doesn't remember to take his pills. He has memory and cognitive deficiencies because of the traumatic brain injury. And so what's happening here is the district court said that's not enough because it was not from the applicable statute of limitations, period. The defendant was the one in charge of providing that evidence. And that's what we're saying at this stage, is they didn't provide the medical care, they didn't document what was going on with him because they wanted to avoid a tolling issue. And so it's different. It's a different analysis than some of the cases that have been cited. In the other cases that were cited by defendants, there were sexual abuse victims that... But you're not relying on the failure to present evidence on the other side, are you? No. Because under Arizona law, it's the plaintiff's burden to present the evidence of unsound mind, and you're saying the evidence here is sufficient to meet that test. That's what we're saying. We're saying that we have sufficient evidence. We have the caregiver affidavit. We have the neurology report saying he does have these cognitive problems, and he has specific issues with his day-to-day activities. Is that Dr. Murato? That's Dr. Murato. The problem that I'm saying, though, is if we follow the district court's ruling, it's going to create almost an inverse chilling effect in the sense that if anybody in prison brings an Eighth Amendment claim based on an injury or has the possibility of doing that later down the road, what incentives does the medical provider have to actually document that he has these mental issues? They'll just say, no, he's good, right? And then later on, when we file a lawsuit and we realize that there's someone else missing from this lawsuit, they can just say statute ran. Sorry. We didn't document it. How much time expired between the time of this injury and the time he was released from prison? So the injury was September 20th, 2012. He was released from prison in the beginning of 2016. So the statute of limitations said run unless he can show inability to take action. Right. Unless he can show that it's told. He filed his original lawsuit in 2013, and he named one of the medical providers that he had, the companies that had actually been providing him medical services. He didn't name the original one. From September 2012 until March of 2013, Wexford was in charge. The private medical company was in charge of his medical care. So he's about two years too late on Wexford unless statutory tolling applies. Unless the statute is tolled or at a lesser argument, it relates back. Yeah. So again — The better argument is the statutory tolling argument. Of course. Yeah. I mean, relation back, I mean, that's a tough one because, you know, as far as I'm concerned, if the statute doesn't apply, I argue that relation back should occur because the same employees were hired by Corizon that were working there for Wexford under the procurement, Arizona procurement services website. You can see their contract and that they offered every one of those people a position. So it basically just changed ownership from one business to another with the same people. And therefore, I would argue that when he submitted an H&R health needs request form in 2013, he did mention the name Wexford, but he didn't include it in his complaint. But my argument would be that Wexford should have been on notice at that point because the Arizona Department of Corrections procedures are such written as so that any person listed in an H&R — Wexford was never served with that document. As far as I know, I mean — There's no record to suggest that. There's no record to suggest that. Very well. So back to the original point, though, is the rest of these cases can be distinguished because this is a prisoner filing an Eighth Amendment claim. He suffered an injury and then was not given proper medical care after he was sent to an outside third-party hospital. If the rule stands that the district court did, it would be almost perverse because it would incentivize these private medical companies to never document brain issues ever. I'm not going to provide you services. I'm not going to document them because I know if I do, the statute could possibly be told. And that's the issue in this case. How can Mr. Garcia, while he — But due diligence in the case of someone who wants to bring a claim here would have established that at the time of his injury, the outside provider was X, Wexford in this case. That would have come up, would it not? Are you asking in the research of the parties? You're making this generic argument, and I'm just wondering if it isn't arguing too much. I'm not sure that you're correct on that. Just because what we have is a prisoner who cannot get his own medical care while he's in prison. He's required to rely on that prison's contract with the private company. Right. Right? So that private company, we're alleging, gave improper care. But if that private company had been served in this case, we wouldn't be here right now. You wouldn't have a problem. That's correct. And so the issue, I think, boils down very simply to David Garcia is of unsound  He didn't appreciate that this — that Wexford should have been included. You're right. That's your stronger argument. But that's exactly it. Right? And, again, we have affidavits from his caregiver that he can't cook, he can't handle finances, he can't, remember, take his pills. And then we have the neurology report from Dr. Murado that says, yes, this is all from that traumatic brain injury. Yeah. We've got the record. All right. Let's hear from the other side. We can save some time. Thank you. Thank you, Your Honors. May it please the Court, my name is Sean Moore, and I'm here on behalf of the defendant Wexford Health Services. Right off the top, I want to address some of the arguments that Mr. Garcia's counsel brought up in his opening remarks, because it seems — it really seems like they're trying to have their cake and eat it, too, so to speak. On the one hand, they attempt to create a burden shift where they try and put the burden on Wexford to come forward with evidence that plaintiff was not of unsound mind. And then on — because they claim that Wexford — I think counsel clarified that. That's why they asked him. And he said no. He's relying on the fact that he came forward with specific evidence to show that there was an inability to manage his daily affairs in this case, in particular the declaration as well as the medical records. Well, that's why I thought it was confusing, Your Honor, because it did come out — and they brought this up a couple of times in their papers as well, where they were trying to argue that Wexford was somehow in control of all of the documents that could show his unsound mind, and therefore the burden should shift to Wexford. But at the same time, they also maintained that they have sufficient evidence to show that Mr. Garcia was of unsound mind at the time. And I just think that those are two incompatible positions. Scalia. But doesn't this boil down to whether or not there is a genuine issue to material fact which would preclude summary judgment, given the fact that Dr. Maroto's mind at the time? Well, I agree with the Court that the question is whether or not there is a question of fact as to whether or not Mr. Garcia had an unsound mind at the time. I just don't think that they've presented any actual well-founded and admissible evidence that he was of unsound mind. So — Well, what's wrong with Dr. Maroto's testimony? It doesn't offer any testimony or any opinion as to Mr. Garcia's mental state at the time period from August 4th, 2013 to August 4th, 2015. Dr. Maroto only met with Mr. Garcia two years after the statute of limitations had already passed. He doesn't offer any opinions as to Mr. Garcia's state of mind during that two-year window. He tells you about Mr. Garcia's state of mind in 2017. Now, it's entirely possible that Mr. Garcia's state of mind could have degraded significantly over the two years from when the statute of limitations period ended to when Dr. Maroto actually visited him. And the Dr. Maroto's records don't actually make any statement as to, you know, following, you know, immediately following the riot where Mr. Garcia was injured, this was his mental capacity. He was actually incapable of carrying on his day-to-day activities. It doesn't say that. It tells us that of Mr. Garcia's subjective complaints following that, but it doesn't offer any actual medical evidence that he was incapable of carrying on his day-to-day activities between that relevant time period. And that's why we say that. Scalia. What does the sister say? Does she help that out at all? No. The sister does not help that out at all, because, again, and they actually admit this in their papers. They say the sister did not visit him in jail. She could not have known what his condition was while he was in jail. And as we've already covered, he was in jail for the entire relevant time period where the statute of limitations was running. So they openly admit that she does not have foundation to offer testimony as to his mental state during the relevant time period. You know, again, she can say, oh, well, he's a different person after he got out of jail from when he before he was in jail, but that doesn't offer any statement as to what his actual capacity was during the relevant limitations period. And that's exactly what they're missing here. Are you disputing the fact that he suffered a traumatic brain injury that subsequent to the surgeries caused permanent impairment? I mean, we haven't gotten to that point in discovery. At this point in the case, we don't. Well, the medical records in this case suggest that to me. Right. That there was permanent cognitive impairment. So that goes to the ability to manage his daily affairs, does it not, when you consider the sister's declaration as to what he's able to do on a day-to-day basis? I disagree with that, Your Honor, for a couple of reasons. First, again, as I've covered, the statements of Dr. Morota are not relevant to his mental space during the relevant limitations period. Also, the sister's testimony is not relevant to the mental space during the relevant limitations period. They're two completely irrelevant pieces of evidence as to the statute of limitations analysis. You cannot take two irrelevant pieces of evidence and then stick them together and then say, all right, now we have a relevant piece of evidence. That's not how it works. They don't support each other. One of them needs to speak on his mental capacity during the relevant limitations period, and neither of them do. And I also would like to sort of contest what you just brought up, Judge Winn, that he had permanent mental impairments after that, after the incident. Permanent mental impairments does not necessarily mean static mental impairments. Things — his mental condition could certainly have gotten worse over time. And what we don't know — like, we know, you know, four years after the incident what his mental capacity was like, but we don't know what his mental capacity was like two years after the incident. We don't know during his time while he was in jail what his mental capacity was like because they have not provided any admissible evidence to speak on that issue. And without admissible evidence to speak on that issue, they can't survive summary judgment. They don't have any admissible evidence saying, you know, at any point prior to August 4th of 2015 that Mr. Garcia was incompetent to carry on his day-to-day activities, and without that evidence, they cannot survive summary judgment. And it's actually interesting, because in their reply brief, they admit that they believe that Mr. Garcia was mentally incapable during that time period. If you look at page 9 of their reply brief, footnote 1, they argue for this same sort of burden shifting that I talked about at the beginning, claiming that of course we can't provide any hard evidence because we don't have anyone that can speak to his condition in jail. Well, they may not have presented anyone who could speak to his condition in jail, but those people were certainly out there, Your Honors. If Mr. Garcia was actually incapable of carrying on his day-to-day activities, then he must have had someone assisting him with those day-to-day activities. They also claim that he had people assisting him with his legal filings that he made in this very case during the time that he claimed to be mentally incompetent. He could have gotten an affidavit from any one of those people saying, oh, yes, I saw Mr. Garcia while he was in jail. He couldn't brush his teeth. He couldn't get out of bed. He couldn't remember to do anything. He couldn't do this, that, and the other thing. And they don't provide any of that. They don't provide a single person that talked to or saw Mr. Garcia during the relevant limitations period and can say that Mr. Garcia was not mentally competent to carry on his day-to-day activities. And without that, I just don't see how they can survive summary judgment here. So we have medical records that discuss the fact that his TBI basically caused permanent injuries and that there's no treatment for the cognitive impairment. So your response to that was, well, we don't know if immediately after the surgery his condition was actually better and then it worsened over time? Did I understand your argument correctly? Yeah. So that's part of it, Your Honor. So part of it is saying that he has permanent injuries doesn't necessarily mean that his injuries were at a certain stage at all points of the timeframe that we're looking at here. Again, these are medical records looking at Mr. Garcia in 2017, and they say in 2017 this is his current condition, this is what he's complaining of. That does not — and even if they are permanent injuries, we don't know what level those permanent injuries were at during the relevant limitations period. So those medical records are not founded to give testimony or to provide evidence on that relevant limitations period. A permanent injury is not necessarily a static injury. So that's part of it. The other part of it is it does not show actual incapability of managing your day-to-day affairs. Now, a lot of the cases that we've shown, such as Flores v. Sargent and Nolde, also say that you can't just show that you're having difficulty managing your day-to-day affairs. I mean, there were plaintiffs in those cases that said, oh, I have PTSD. They provided expert medical affidavits saying this significantly affects their ability to carry on their day-to-day life. It makes doing things very difficult. Very difficult is not the standard. The standard is actual incapability. And unless they're able to provide someone within that relevant timeframe saying that Mr. Garcia was actually incapable, then they can't survive. And I don't think they've provided that. And the sister's statement that the head trauma that he received from the assault has completely changed his capability to function in normal day-to-day activities. He's now like a child. He forgets his vocabulary, incapable of conversation. And she gave very specifics. And you're saying that's not enough because there's no indication that she visited him in prison? Yes. I mean, I would say that she doesn't ---- I don't understand that argument because she is indicating in her capacity as now his ---- she's got the power of attorney and she helps him manage his daily affairs that after this injury, he completely changed in terms of how he's able to function. Yes. I mean, they openly admit that she did not visit him or see him at all while he was in prison. At the point that they admit that, then she is not competent to testify as to his condition while he was in prison. She does not have foundation to offer those opinions. She has to have seen him during that timeframe and said during the timeframe that the limitations period was running, he was incapable of managing his day-to-day affairs. And she wasn't there. They admit in their papers that she was. What's the standard to evaluate whether he was of unsound mind under Arizona law for purposes of statutory tolling? A preponderance of the evidence? I mean, the standard is, it's not exactly the most artfully stated, but the standard is they have to present, quote, hard evidence and credible evidence that the person either was incapable of managing their day-to-day affairs or was incapable of recognizing the legal rights deriving from the alleged wrongs. And do you interpret that as preponderance or something higher? I would say that that probably comes to preponderance. Interestingly, the cases that are cited and the cases that are discussed don't actually arrive at a decision as to what is enough. They just try and arrive at a decision as to what can survive summary judgment, because that's how all these cases arose, was out of a motion for summary judgment. But I would say that it's probably a preponderance of the evidence. What the standard is, is that they have to come forward with hard evidence that the person was incapable of managing their day-to-day affairs. And without offering any testimony or evidence from any person who actually saw Mr. Garcia during the relevant limitations period, they cannot make those claims. They cannot carry that burden. And there were, like I said earlier, there were options available to them if they wanted to obtain that evidence. If he was really receiving as much assistance as he claims that he was, then surely there were people out there that helped him, that saw him, that could testify that he was incapable of doing these things and that they had to assist him in doing them, otherwise they wouldn't have gotten done. And they have not presented that evidence. They've only presented the evidence of people that saw him years afterwards. We don't know whether his condition got much worse. We don't know whether he was capable of doing those tasks inside a — while he was there. We don't offer any evidence on that point. And without offering evidence, because it's their burden, they cannot survive summary judgment. I don't believe that the Court is particularly interested in the relation back issue, so I won't offer any of my arguments on that. The last thing that I want to talk about here is something that Mr. Garcia's counsel brought up in his remarks as well, which is that he believes that an affirmation here would create a perverse incentive for medical providers in jails where they wouldn't want to care for them. I think you mean Mr. Woods speaking for Mr. Garcia. Yes. Did I — I said counsel for Mr. Garcia, correct? Oh, okay. I hope I did. I thought I heard you say Mr. Garcia. I don't believe that's Mr. Garcia himself. But, yes, Mr. Woods. They argue that an affirmation would create this perverse incentive where medical providers would no longer want to provide care for prisoners with brain injuries and would not want to document problems with brain injuries on the fear that they may waive some tolling argument somewhere down the road. I mean, I think that that argument does not carry a whole lot of water, Your Honors. These medical providers, as we're talking about right now, are required by law to provide these medical services, and I just don't think it's credible that any of them would break that law on the possibility that the person would then subsequently forget to sue them, and then they would be waiving their potential tolling defense because they provided him these medical services. That just seems a little too far out there for me. So unless the Court has any more questions for me, I will yield the remainder of my time. Thank you. Thank you. Thank you, Your Honors. I just have a few points I'd like to address on this. Sitting on this circuit bench, I assume, maybe improperly, that you have seen cases related to Eighth Amendment violations in medical provision. There's a reason why Wexford was no longer the medical provider of choice as of March 2013, because they had too many violations. Corizon comes in. Now, Corizon is dealing with that same issue in other areas. So we have this system in place in Arizona with these private medical providers that cut costs, they scrimp, and they have every incentive, every incentive, to not document the most severe injuries, because then that will come back and bite them later down the road. So I don't think it's ludicrous or ridiculous to me. Is there any evidence in this record that Wexford purposely engaged in that kind of behavior? I don't have any evidence that I have been able to discover yet, because we're fighting to keep Wexford in the case. There's nothing I can point to at this point that says that they purposefully did that. All I can say is that they were — they lost their contract in March of 2013, about five months after the — or six months after the injury to Mr. Garcia. I think that, contrary to the arguments that we're hearing here from defendants — You're leaving sort of an implication in the air that if they lost their contract, it was because of some nefarious behavior. Is that correct or not? I'm not trying to make that implication, Your Honor. I'm just trying to say that there is a reason that they no longer provided health care services after that point. But that's not in the record before. It's not. But I'm just trying to address some of the preposterousness of counsel's argument against me, that my argument is ridiculous. I don't think it is. I think it does create that incentive. I think that it creates now a situation where I have a client that every aspect of his life is managed by the prison. He doesn't get to make choices about when to eat. He doesn't get to make choices about his finances. He doesn't get to make choices about when he goes to break. Things along those lines. He doesn't get to bring in a private health provider. He doesn't get to have his PCP that he used to have, come to the prison and check him out. He has to rely solely on the system that's in place. And when that's the case, it's impossible to find hard evidence medically when the actual claim is that they didn't provide that medical care. Do you have any lay witnesses who can testify about his condition before the statute ran? The issue that we have with that, Your Honor, is that he can't remember his inmates that helped him. He can't remember the people that would help him write his H&Rs and things along those lines. And even if he could, getting another prisoner to testify is a very difficult process. It just — there's so many roadblocks there that I'm not — Well, you might get a guard or somebody who was working there. Yeah, the guards, yeah. I mean, we're suing them. So it creates a situation where I have to get the evidence from a defendant, and the defendants clearly would not give me that because that would prove my case. What's your best witness to show his incapability during the period before the statute ran? That's correct. Is it the sister? The sister is my best — would be the best in terms of she knew him before the injury and she knew him after the injury. And she can testify that he has completely changed. And then you — But you've got some very detailed observations made by Judge Tumatewa specifically on this. How do you get around those? In regards to the fact that the H&Rs were submitted or that she — or that the sister only never saw him during his incarceration? Yeah, right. I think that's the entire point of my argument. It's — I've got a catch-22 here. How do I get the medical team who didn't document anything to tell me that he had this brain condition after the traumatic brain injury? All I can do is rely — No, no, no. We're talking about unsound mind at this point, are we not? We are. Okay. And your challenge is to establish that you have current testimony which relates back to direct observations made within the statute of limitations period that he was unsound mind as of that time, which would entitle you to tolling. Correct. And if you look at Dr. Murado — And your best witness is the sister. I think that you have to combine both Sylvia and Dr. Murado's report because Sylvia can — Dr. Murado clearly has no prior knowledge and doesn't even presume that he was unsound. He was of unsound mind sometime after 2013. Correct. Dr. Murado would have no firsthand — Okay. And that's exactly what the trial judge observed in her summary judgment ruling. And I think she overstepped her bounds. I think that she decided an issue for the jury on the facts that we have because Dr. Murado can clearly tie the injuries back to the traumatic brain injury. And Sylvia can clearly talk about how he was before the injury and how he was after. And I think that that becomes the issue for the jury. But the showings did not reveal that so far as this record is concerned. I'm sorry? But the showings in this record did not reveal that. I mean, you — I think they do. The thing is, we don't have anything other than David Garcia's own statements on his H&Rs during the timeframe. And every one of them, he says, hey, I can't figure this stuff out. My brain is — I'm dizzy. I don't know what's going on. In all of his filings, he says the same thing with the court. He says, I can't understand this. I need assistance of counsel. And each one of those requests were denied. It wasn't until after he got out of prison that he found me and hired me to represent him. And that's when we started trying to fix this. Your argument is that the sister's declaration, although not contemporaneous to the relevant time period, it sort of dovetails with the symptoms that he described when he submitted those letters while incarcerated. That's correct. All right. We've got the argument. Thank you very much, both sides. The matter is submitted.
judges: O'scannlain, Siler, Nguyen